Argued and submitted June 30, 2000, affirmed February 28, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# MICHAEL BRIDWELL JOHNSTONE,
*Appellant.*

(C972208CR; CA A102469)

19 P3d 966

Andrew S. Chilton, Deputy Public Defender, argued the cause for appellant. With him on the brief was David Groom, Public Defender.

Ann Kelley, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge, and Armstrong, Judge.

DEITS, C. J.

**DEITS, C. J.**

Defendant appeals from convictions for first-degree manslaughter, ORS 163.118, third-degree assault, ORS 163.165, and driving under the influence of intoxicants, ORS 813.010. He argues that the court erred in admitting evidence of bad acts under OEC 404(3) for the limited purpose of determining whether he had acted with the requisite "extreme indifference to the value of human life" required for the manslaughter and assault convictions. As explained below, we hold that the trial court erred in admitting some of the evidence in question. However, because we conclude that the admission of that evidence was harmless error, we affirm defendant's convictions.

Defendant caused an automobile collision that resulted in the death of Murphy and physical injury to Wagner. Defendant was charged with first-degree manslaughter for causing Murphy's death and was charged with third-degree assault for causing physical injury to Wagner by means of a dangerous weapon. To prove first-degree manslaughter, the state was required to prove that defendant committed homicide "recklessly under circumstances manifesting extreme indifference to the value of human life." ORS 163.118(1)(a). Similarly, to prove the type of third-degree assault with which defendant was charged, the state was required to prove that defendant "[r]ecklessly cause[d] physical injury to another by means of a deadly or dangerous weapon under circumstances manifesting extreme indifference to the value of human life." ORS 163.165(1)(c).

In order to demonstrate that defendant acted recklessly "under circumstances manifesting extreme indifference to the value of human life" for purposes of the manslaughter and assault charges, the state sought to introduce evidence of two other occasions that defendant had driven under the influence of intoxicants. Defendant moved *in limine* to exclude evidence of those other two incidents on the ground that it constituted inadmissible character or propensity evidence. OEC 404(2).[1] The state argued that, although

---

[1] OEC 404(2) provides:

not admissible under OEC 404(2), the evidence nonetheless was admissible under OEC 404(3).[2] OEC 404(3) provides:

> "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The state argued that the evidence of defendant's two other incidents of driving under the influence of intoxicants demonstrated the mental state of recklessness under circumstances manifesting extreme indifference to the value of human life, similar to the "knowledge" or "intent" purposes listed in the statute. It was the state's position that the earlier incident, which occurred some seven months before the collision involved in this case, resulted in defendant being placed in a diversion program. It argued that the second incident, which occurred nine days *after* the collision at issue in this case, was a "clear indication" of defendant's "indifference." The state further argued that the incidents should be viewed on a continuum and that they demonstrated that the fatal collision was not "an isolated incident where an individual exercised bad judgment." The trial court admitted the evidence, concluding that the evidence demonstrated "an attitude of extreme indifference to the value of human life, a mental disposition, if you will, or predisposition in that regard."

---

"Evidence of a person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

"(a) Evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same;

"(b) Evidence of a pertinent trait of character of the victim of the crime * * *;

"(c) Evidence of the character of a witness * * *; or

"(d) Evidence of the character of a party for violent behavior offered in a civil assault and battery case when self-defense is pleaded and there is evidence to support such defense."

[2] The state makes no argument that the evidence was admissible under OEC 404(4).

Evidence at trial showed that defendant began drinking beer early in the morning on July 27, 1997. Around noon, defendant and Wagner left Forest Grove to look for a friend of Wagner's daughter. Defendant was driving, and they took beer with them. After locating the friend at a campground, they drove to Tillamook. Defendant continued to drink beer during the drive. They stopped at a Shilo Inn, and the friend offered to drive because she believed that defendant was intoxicated. Defendant continued to drive and continued to drink beer as he drove. At one point, he cut off another car and swerved within his lane of traffic. They then stopped at a winery, where defendant drank several glasses of wine and also bought several bottles. They opened one of the bottles and drank from that. Defendant then drove the friend back to the campground and drank beer while doing so. Defendant and Wagner then left the friend at the campground. Neither defendant nor Wagner had any memory of what happened after they left the campground for the second time.

Shortly after defendant and Wagner left the campground, defendant's vehicle crossed the center line on Highway 47 and struck an oncoming vehicle while traveling between 54 and 64 miles per hour. A yellow road sign recommended a speed of 35 miles per hour at that portion of the road. The driver of the oncoming vehicle, Murphy, was killed in the collision. Defendant and his passenger Wagner were injured in the collision. Defendant's blood-alcohol level at the time of the collision was between .21 and .23.

Further evidence at trial showed that, on November 4, 1996, defendant had been arrested in Forest Grove for driving under the influence of intoxicants. At that time, he failed field sobriety tests, and his blood-alcohol content was .14. As a result of that arrest, defendant entered into a diversion agreement with the Washington County District Court. Under the terms of that agreement, defendant was to participate in diversion from December 15, 1996, to December 16, 1997. Specifically, defendant was to undergo diagnostic assessment, complete required treatment, and not use any intoxicant in conjunction with the operation of any motor vehicle during that 12-month period. Defendant attended only two of five scheduled diversion classes. He testified that

it was difficult for him to go to the classes because he felt that he needed to stay drunk to be well. He further testified that he knew it was a requirement of the diversion program that he not drink and drive, but it was his belief that he could not function without alcohol. He also testified, however, that he held down jobs in the year before the fatal collision and that he did not drink while working.

Evidence at trial also showed that on August 6, 1997, a little over a week after the fatal collision that resulted in the charges at issue in this case, defendant again had been arrested for driving under the influence of intoxicants after a police officer observed him cross into the wrong lane of traffic. Defendant again performed poorly on field sobriety tests. His blood-alcohol content was .18 shortly after that arrest.

The court gave the following limiting instruction to the jury concerning the events that occurred on November 4, 1996, and August 6, 1997:

"You may consider the evidence of other incidents of driving under the influence only for the relevance, if any, you may find either incident has to Michael Johnstone's state of mind on July 27th, 1997. You may not use that evidence for any other purpose in your assessment of the evidence and deliberations."

The jury returned a verdict of guilty on all charges, and the court sentenced defendant to a total of 120 months' imprisonment.

On appeal, defendant argues that his convictions for manslaughter and assault should be reversed because the trial court erred in admitting evidence of his driving under the influence of intoxicants on November 4, 1996, and August 6, 1997. Defendant asserts that the evidence in question was not admissible for any relevant noncharacter purpose under OEC 404(3). Both parties argue about the applicability of the test from *State v. Johns*, 301 Or 535, 725 P2d 312 (1986), to the facts of this case.

Defendant acknowledges that the state might have been able to admit evidence from defendant's diversion program to demonstrate that he knew the risks associated with drinking and driving. He asserts, however, that the state

would have been required to call a witness from the diversion program to testify that defendant specifically had been told of the dangers of drinking and driving. He further argues that the state "expressly disavowed this theory of admissibility." We note, however, that the state did not disavow that general "theory of admissibility" at all. Rather, the state argued that the evidence of the November 1996 arrest and diversion agreement were relevant to defendant's state of mind concerning the dangers of drinking and driving, but that the state did not intend to call a witness to provide specific information as to what defendant was told in the diversion classes that he attended.

The state argues that evidence of both the November 1996 and the August 1997 incidents was relevant and admissible under OEC 404(3) because that evidence demonstrated defendant's state of mind at the time of the July 1997 fatal collision. The state notes that, in order to demonstrate that defendant acted with the requisite recklessness under circumstances manifesting extreme indifference to the value of human life, it was required to show defendant's "subjective awareness of the risks to which he expose[d] others." *State v. Hill*, 298 Or 270, 280, 692 P2d 100 (1984).

██ We will address the admissibility of each of the incidents separately. As to the November 1996 incident that resulted in defendant's participation in diversion, we agree with the trial court that it was admissible. However, we do not use the *Johns* "intent" analysis under these circumstances, because the state did not seek to admit that evidence to show that defendant acted with the same intent during the 1996 incident as he did during the July 1997 fatal collision.[3] Under *Johns*, a court looks for similarities between the prior bad acts and the present charged act; the question is whether the jury could infer that, because the defendant acted with a certain intent on one occasion, he or she acted with the same intent on another occasion. That analysis does not apply here, at least in regard to the November 1996 incident. This

---

[3] Under *Johns*, in evaluating prior bad act evidence on the issue of intent or absence of mistake, a court considers whether both acts required intent, whether the victim was the same or in the same class, whether the types of acts were the same or similar, and whether the physical elements of the acts were similar. 301 Or at 555-56.

evidence is more akin to "knowledge" evidence under OEC 404(3). The November 1996 incident, and the resulting diversion, makes up a part of the "circumstances" that could be viewed as manifesting defendant's "extreme indifference to the value of human life" when he drove under the influence of intoxicants in July 1997. As the court stated in *State v. Hill*, 298 Or at 280:

> "[I]ntoxication combined with negligent driving can constitute criminal negligence, recklessness or recklessness under circumstances manifesting extreme indifference to the value of human life, depending on the nature of the accused's erratic driving, the extent of his intoxication and the attitude he displays toward the consequences of his acts. The difference between criminal negligence on the one hand and the two levels of recklessness on the other is *defendant's subjective awareness of the risks to which he exposes others*." (Emphasis added.)

As a result of the drunk-driving incident in November 1996, defendant entered into a diversion agreement with the court in which he not only agreed to refrain from using intoxicants in conjunction with the operation of motor vehicles for a period of one year, but also agreed to complete recommended treatment. Diversion programs educate individuals on the physiological effects of alcohol, the psychological and sociological consequences of abuse of alcohol including the effect on families, the effects of alcohol on driving performance, penalties for driving under the influence of alcohol, alcoholism as a problem and a disease, and alternatives to drinking and driving. OAR 415-054-0020. We disagree with defendant's suggestion that only testimony from a provider of diversion services that defendant specifically had been informed of the dangers of drinking and driving would be admissible. In considering defendant's state of mind on July 27, 1997, the November 1996 incident and the diversion agreement are relevant in that they demonstrate that defendant chose to drive while drinking on July 27, although he previously had been involved in a drunk-driving incident that had resulted in his agreement to participate in the diversion program. Thus, on July 27, 1997, defendant had not merely had the *opportunity* to educate himself about the dangers of drinking and driving, he had the *obligation* to do so

under his diversion agreement. The November 1996 incident and the resulting diversion agreement are circumstances that are relevant to whether defendant acted in July 1997 with the requisite state of mind; specifically, they are relevant to whether he had a subjective awareness of the risks to which he exposed others. The trial court correctly admitted evidence of the November 1996 incident and the diversion agreement for the limited purpose of establishing defendant's subjective awareness of those risks.

■ The same analysis, however, does not apply to the August 1997 incident. At issue is defendant's "awareness of the risks to which he expose[d] others" on July 27, 1997. *Hill*, 298 Or at 280. Under some limited circumstances, an act that occurs later in time than the crime for which a defendant is being prosecuted may be relevant and admissible under OEC 404(3) to demonstrate intent. The Oregon Supreme Court described the "doctrine of chances" in *Johns*:

> " '[T]he more often the defendant performs the actus reus, the smaller is the likelihood that the defendant acted with an innocent state of mind. The recurrence or repetition of the act increases the likelihood of a mens rea or mind at fault. In isolation, it might be plausible that the defendant acted accidentally or innocently; a single act could easily be explained on that basis. However, in the context of other misdeeds, the defendant's act takes on an entirely different light.' "

*Johns*, 301 Or at 552, *quoting* Edward Imwinkelried, *Uncharged Misconduct Evidence*, 8 § 5.05 (1984). Thus, under *Johns*, evidence of other bad acts can be used under some circumstances to demonstrate that a defendant acted with the requisite intent on one occasion because he had done so on other occasions.

■ In *State v. Gibson*, 144 Or App 523, 526, 928 P2d 344 (1996), *rev den* 325 Or 80 (1997), the defendant was charged with manslaughter of one of his children, and the state was required to prove that he acted recklessly under circumstances manifesting extreme indifference to the value of human life and that he previously had assaulted a child or children. *See generally* ORS 163.115(1) (murder by abuse

occurs when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age and previously has engaged in a pattern or practice of assault of the victim or another child under 14 years of age). Circumstantial evidence suggested that the defendant had shot his son and then had hidden the body. *Id.* at 526-27. The state sought to introduce evidence of the defendant's conduct toward another child two years after the disappearance of his son. *Id.* at 528. That evidence indicated that the defendant had hit his daughter on more than one occasion hard enough to knock her down and leave red marks on her. *Id.* at 529. The state argued that, under the "doctrine of chances," the defendant's assaults on his daughter made it more likely that the defendant's shooting of his son was not an accident, but that he had acted with the requisite recklessness under circumstances manifesting extreme indifference to the value of human life. In rejecting the state's argument, we stated:

> "The present case does involve an unexplained event, Tommy's disappearance, that could be attributed to an accident. However, the testimony about defendant's abuse of Lisa is not evidence of a second unexplained disappearance that would tend to make it less likely that the first disappearance was accidental. * * *. The similarities between the two events that occurred in *Johns* does not exist here. The fact that defendant struck Lisa causing bruises several years after Tommy's disappearance does not tend to make it more likely that he recklessly caused Tommy's death under 'circumstances manifesting extreme indifference to the value of human life.' ORS 163.115(1)(c). The evidence, if relevant at all, tends only to prove that 'once a child abuser always a child abuser.'" *Id.* at 531-32.

The evidence of defendant's conduct in August 1997 in the present case suffers from the same problems as the evidence we held to be inadmissible in *Gibson*. The similarity of the circumstances surrounding the bad acts evidence and the charged conduct in both cases is superficial, at best. Driving under the influence of intoxicants does not require the same intent as does the type of manslaughter and assault alleged in this case. The elements of the crimes of assault and manslaughter are not the same as the elements of driving under the influence of intoxicants. The physical acts are similar

only insofar as they involved defendant's use of alcohol and motor vehicles.

The August 1997 arrest occurred after an officer observed defendant turn his vehicle into the wrong lane and drive in a jerky fashion for several blocks. No evidence indicated that defendant was driving too fast or that his driving threatened or harmed oncoming traffic, as was the case in the charged incident. The only similarity between the incidents was that, on both occasions, defendant drove after drinking too much. Like the "once a child abuser always a child abuser" evidence in *Gibson*, this evidence would have tended to show "once a drunk driver always a drunk driver." It would not have furthered the state's contention that, on July 27, 1997, defendant acted recklessly "under circumstances manifesting extreme indifference to the value of human life." The trial court erred in admitting the evidence concerning the August 1997 incident.

■■ We do not, however, presume evidentiary error to be prejudicial. OEC 103(1). Evidentiary error does not require reversal if there is substantial and convincing evidence of guilt and little, if any, likelihood that the error affected the verdict. *See generally State v. Carr*, 302 Or 20, 27, 725 P2d 1287 (1986). Here, it is not disputed that defendant's action caused Murphy's death and caused physical injury to Wagner. Further, there is no serious dispute that defendant acted recklessly in doing so. The only issue is whether defendant acted recklessly "under circumstances manifesting extreme indifference to the value of human life." We conclude, on this record, that there is little likelihood that the jury would have concluded that defendant had *not* acted "under circumstances manifesting extreme indifference to the value of human life," even if the evidence of the August 1997 incident had not been admitted. On July 27, 1997, defendant caused the death of one person and the injury of another after consuming what can only be described as a vast amount of alcohol over the course of an entire day. He did so by driving a vehicle after a friend had pointed out to him his inability to drive safely and despite the fact that he had been previously arrested for driving under the influence of intoxicants. He did so after entering a formal agreement with a

court that he not only would refrain from drinking and driving, but that he also would undertake to educate himself about the dangers of drinking and driving. Further, as noted above, the trial court instructed the jury to limit its consideration of the disputed evidence to defendant's state of mind at the time of the accident. Given the evidence presented to the jury and the limiting instruction, there is little likelihood that the jury would have reached a different verdict had it not heard evidence of the August 1997 incident. We conclude that the court's error in admitting evidence of the August 1997 incident was harmless.

Affirmed.