Argued and submitted March 6, reversed and remanded April 2, 2014

In the Matter of C. W.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

J. M.
and A. M. W.,
*Appellants.*

Washington County Circuit Court
J120144;
Petition Number 01J120144;
A155113

325 P3d 35

Holly Telerant, Deputy Public Defender, argued the cause for appellant J. M. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Megan L. Jacquot argued the cause and filed the brief for appellant A. M. W.

Michael R. Salvas, Assistant Attorney General, argued the cause for respondent. With him on the briefs were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Wollheim, Judge, and Lagesen, Judge.

LAGESEN, J.

**LAGESEN, J.**

Mother and father (parents) appeal a permanency judgment that changed the permanency plan for their daughter from reunification to adoption. They each assign error to the juvenile court's ruling that parents could not present expert testimony and other evidence at the permanency hearing identifying the cause of the "unexplained physical injury" that resulted in the juvenile court's initial assumption of jurisdiction over parents' then-infant daughter, C.[1] The juvenile court excluded the evidence on the ground that it was not relevant to the issues at the permanency hearing but, instead, represented an attempt by parents to relitigate the original jurisdictional findings. We review the juvenile court's relevancy determination for legal error, *State v. Carreiro*, 185 Or App 19, 22, 57 P3d 910 (2002), and reverse.[2]

This case arose when, at a routine pediatric exam, the pediatrician observed a small bruise on the cheek of then-two-month-old C. Concerned about the potential for abuse, the pediatrician ordered a skeletal survey of C. The x-rays were "concerning for a probable healing metaphyseal corner fracture in [C's] distal right tibial metaphysis," that is, a possible fracture of C's tibia.[3] Doctors opined that the fracture was indicative of nonaccidental trauma.

Concerned that C had been abused, the Department of Human Services (DHS) removed C from parents' care and placed her with a foster family. A few months later, parents admitted to facts giving rise to the juvenile court's jurisdiction. Specifically, each parent admitted that his or her "lack of parenting skills" impaired his or her "ability to provide minimally adequate care" for C. Each parent also admitted that C "sustained an unexplained physical injury to include[] distal tibial metaphyseal fracture in the child's

---

[1] Parents raise other assignments of error as well. We reject them all without discussion.

[2] We decline parents' request to decide this case ourselves on *de novo* review. The trial court is in the best position to resolve the factual issues presented by this case after hearing the live testimony of pertinent witnesses.

[3] The "tibia" is commonly known as the shinbone. *Stedman's Medical Dictionary* 1835 (27th ed 2000).

tibia while in the care of *** mother and father."[4] Based on those admissions, the juvenile court assumed jurisdiction over C in August 2012.

In the ensuing months, DHS provided an array of services and classes to parents, in which parents participated fully. Parents also participated in regular, twice-weekly supervised visits with C. However, DHS determined that parents were not making sufficient progress toward reunification with C, and requested that the juvenile court change the permanency plan for C from reunification to adoption.

In discovery for the permanency hearing, DHS provided C's x-rays to parents for the first time. According to father's lawyer, the x-rays had not been provided to father's lawyer in earlier discovery, even though she had "made a request for all discovery at the beginning of this case." Father's lawyer, "not being medically trained, was not aware that all medical information had not been provided." Upon receiving the x-rays, father promptly had the images examined by a medical expert, Gabaeff. Gabaeff, based on his review of the x-rays and other medical information about C, opined that the injury to C's tibia resulted from infantile rickets, and not from "abusive fractures."

Before the hearing, DHS moved *in limine* to exclude Gabaeff's testimony and any reports. In DHS's view, in attempting to introduce Gabaeff's opinion about the cause of C's fracture, "parents [were] attempting to relitigate the jurisdictional basis at the permanency hearing" and were attempting to introduce evidence that was not relevant to the two issues at the permanency hearing: whether DHS had made reasonable efforts to reunify the family, and whether parents had made sufficient progress toward making it possible for C to return safely home. ORS 419B.476(2)(a). The juvenile court granted the motion to exclude the evidence.

At the hearing, DHS's primary theory as to why parents had not made sufficient progress to permit C to return

---

[4] Because father's paternity had not been established at the time of the initial jurisdictional hearing, father also admitted that he was C's "biological father and [was] in the process of establishing" legal paternity.

safely home was that parents had not provided an explanation for C's fracture. DHS argued that it is "almost impossible to gauge sufficiency of progress when there is no way to know what happened and to then be able to have a meaningful conversation about how to prevent that from happening again in the future." Consistent with that theory, DHS's caseworker testified that she had not been able to facilitate parents' progress toward reunification because "we really have no idea how this occurred with [C]." The caseworker explained that, in addition to participating in services, "progress also is how people are able to voice their responsibility in what has occurred. They are able to make a plan about how that won't happen again."

Following the hearing, the juvenile court found both that DHS had made reasonable efforts toward reunifying the family, and that parents were not making sufficient progress toward meeting the expectations set forth in the case plan for C. Based on those findings, the court ordered that the case plan be changed from reunification to adoption, and entered a permanency judgment reflecting that decision.

Both parents timely appealed. On appeal, they assert that the juvenile court erred when it excluded Gabaeff's testimony and report opining that C's tibia injury resulted from rickets. We agree.

Contrary to the juvenile court's conclusion, the evidence was admissible at the permanency hearing because it was relevant to the assessment of whether parents had made sufficient progress toward ameliorating the conditions that led to the tibia injury, making it possible for C to return safely home. As DHS's own witness testified—and as DHS itself argued—the assessment of a parent's progress toward addressing an unexplained injury ordinarily requires a determination of the cause of the injury. That is so because it is a determination of the cause of the injury that enables DHS and the parent to identify what actions are needed to ameliorate the conditions that led to the child's unexplained injury.

Here, were a factfinder to credit Gabaeff's testimony that C's tibia injury resulted from rickets rather than abuse,

that finding would result in an entirely different assessment of parents' progress towards C's safe return home than would a finding that the injury resulted from abuse rather than rickets.[5] If C's injury resulted from rickets, then the focus on parents' progress would be on what, if anything, parents should have done differently in order to recognize that their child had rickets, and what steps parents should take to avoid a similar situation in the future. If, on the other hand, C's injury resulted from abuse, the focus on parents' progress would be on what steps parents should take in order to avoid further abusive conduct.[6]

Moreover, contrary to DHS's argument, parents' attempt to introduce Gabaeff's testimony and report was not an attempt to relitigate parents' jurisdictional admissions regarding the injury to C's tibia. That is, parents did not seek to introduce the evidence to demonstrate that C was not injured, that the injury was not "unexplained" at the time the juvenile court assumed jurisdiction over C, or that the unexplained injury was not of the sort that permitted the juvenile court to assume jurisdiction over C. In addition, parents did not admit or stipulate to any facts regarding the cause of the injury to C, and the juvenile court did not find

---

[5] The testimony of the psychologist who evaluated father supports this point. The psychologist testified that he assessed father's progress based on the assumption that C's tibia injury resulted from abuse, in the light of father's failure to explain the injury. He further testified that his assessment would be different if the injury did not result from abuse.

[6] Our decision in *Dept. of Human Services v. T. R.*, 251 Or App 6, 282 P3d 969, *rev den*, 352 Or 564 (2012), illustrates how a determination of the cause of an unexplained injury bears on the determination of a parent's progress to make it possible for a child to return safely home. There, the parents stipulated to jurisdiction based on their child's unexplained bone fractures. *T. R.*, 251 Or App at 8. At a permanency hearing, the juvenile court found as fact that the injuries to the child either had resulted from the parents themselves or that, at a minimum, the parents knew or should have known of the injuries. *Id.* at 11-12. The juvenile court also found that "the parents' denial of awareness of the child's injuries and distress was not credible." *Id.* at 11. In light of those unchallenged factual findings about the nature and cause of the child's injury, and the parents' knowledge of it, we reasoned that the juvenile court correctly concluded that the parents had not made sufficient progress to permit the child to return safely home where the parents continued to deny knowledge of the child's injuries. *Id.* at 15. In other words, it was precisely because the cause of the injury to the child was one that the parents knew or should have known about, and because the parents lacked credibility regarding their awareness of the injury, that the parents' ongoing denials of any knowledge of the injury demonstrated that they had not made progress in grappling with the conditions that led to the child being injured.

any such facts in connection with its jurisdictional determination. Because there was never any admission, stipulation, or finding as to the cause of the injury, parents' attempt to introduce evidence that the injury resulted from rickets does not represent a collateral attack on any prior admission, stipulation, or finding as to the cause of the injury.

In summary, the cause of C's tibia injury informs the determination of whether parents have made sufficient progress to permit C to return safely home. The testimony of Gabaeff was probative as to the cause, and parents were entitled to present it to the juvenile court at the permanency hearing, in light of the fact that there was no prior admission, stipulation, or finding as to the cause of C's injury. Accordingly, we reverse and remand for the juvenile court to conduct a new permanency hearing at which parents are permitted to introduce evidence regarding the cause of C's unexplained tibia injury.

Reversed and remanded.